STATE of Missouri, Respondent,

v.

Robert HUTTON, Appellant.

Robert HUTTON, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 58070, 59149.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 28, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 3, 1992.

Application to Transfer Denied
April 21, 1992.

Melinda Kay Pendergraph, St. Louis, Beth A. Davis, Union, Raymond Legg, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

SATZ, Judge.

A jury found defendant, Robert Hutton, guilty of assault, first degree, § 565.050 RSMo 1986,[1] armed criminal action, § 571.-015, and kidnapping, § 565.110. The court found defendant to be a prior, persistent and class X offender, §§ 558.016.2, 558.-016.3, 558.019, and sentenced him to imprisonment for 30 years on the assault charge, 10 years on the armed criminal action charge and 10 years on the kidnapping charge. The sentences are to be served consecutively.

Defendant appeals from these sentences and also appeals from the denial of his Rule 29.15 motion. For the limited purposes we set out in our opinion, we reverse and remand the sentences and the denial of the motion.

■ The charges against defendant arose from a bizarre scenario lasting several days. The state charged defendant with committing an assault, first degree during that scenario by charging that he "attempted to kill or cause serious physical injury to C__ W__ by shooting her and in the course thereof inflicted serious physical injury on C__ W__." Defendant contends that "an essential element" of assault, first degree is the culpable mental state of "purposefully", and, because that element was not alleged, he contends, the charge is fatally defective. We disagree.

■ An attempt to commit a crime is an assault in the first degree if a person "attempts to kill ... or attempts to cause serious personal injury to another person." § 565.050. No useful purpose would be served in detailing here the reasoning defendant uses to read "purposefully" into this definition. Suffice it to say that Rule 23.01 sets out the essential requirements of an indictment or information, and a charge meets those requirements if it is "substan-

tially consistent with the forms of indictments or informations which have been approved by [our Supreme] Court." Rule 23.01(e); e.g. State v. Bailey, 760 S.W.2d 122, 124 (Mo. banc 1988). The pertinent part of the approved form for the charge of assault, first degree reads:

[The accused] attempted to kill or cause serious physical injury to [name of victim] by [Insert means by which attempt was made such as shooting ...] and in the course thereof inflicted serious physical injury on [name of victim].
MACH—CR 19.02 [1987 Revision].

The charge against defendant follows this form to the letter and, therefore, is not defective.

Defendant next contends the trial court erred by admitting into evidence testimony of Detective Edward Magee in which he related statements C__ W__ had made to him about the incident. This testimony, defendant contends, was hearsay which impermissibly bolstered C__ W__'s testimony.

On direct examination, C__ W__ described in detail what occurred over the five to six day period leading up to the crimes in issue. Stripping her testimony to its essentials, she said she left her husband sometime in August 1987 and went to her cousin's house. On August 24 or 25, she went to defendant's house. Over the next three or four days, she, defendant, and defendant's friend Kenneth Clay visited a woman named Sharon. During this period of three or four days, C__ W__ drank wine and smoked marijuana while defendant and Clay injected cocaine. A man called "Fatman" also was with them on several occasions.

At one point, Sharon wrote a note to defendant accusing C__ W__ of stealing his cocaine. Defendant then gave a pistol to Clay and Clay fired the pistol into the floor next to C__ W__. Subsequently, after C__ W__ had called a friend, defendant asked her if she had called the police.

On the day the crimes occurred, C__ W__ was in the bedroom of defendant's house

1. All statutory citations are to RSMo 1986, un-less otherwise cited.

when her husband came to the house. She opened the bedroom door and saw defendant put a pistol in the trash. She then saw defendant, Clay, her husband and Fatman leave the house. She retrieved the pistol from the trash can and put it into her purse. She then called 911 because she thought something would happen to her. She also called her sister in Detroit and told her that if something happened to her, her husband and defendant did it.

Fatman returned to the house and told C— W— that defendant wanted to see her. As she and Fatman were leaving the house, the police arrived. She told the police that no one had called them. She and Fatman then went to Fatman's house. Fatman took her into the house. Defendant and Clay were there. Defendant asked her why she took his cocaine. She denied taking it and defendant hit her with a pistol. He accused her of taking his drugs and setting him up with the police, and he continued to beat her.

Defendant made a phone call, then told C— W— she was "going to die a horrible death." About two hours later, defendant, Clay and C— W— went to Sharon's house. Sharon and defendant "shot cocaine"; then, defendant told Sharon to hit C— W—. Sharon complied, hitting C— W— with a gun. Defendant, while pointing a gun at C— W—, asked her whether she would call the police if he let her go. She said she would not. Nevertheless, defendant shot her in the right shoulder.

Defendant told Clay to tie up C— W—. Clay tied up her arms and legs and gagged her with plastic. Clay then took her outside to a car. Defendant opened the trunk of the car and Clay put her in it.

While the car was being driven, C— W— untied herself, found a pistol in the trunk, and fired three times into the front of the car. Three shots were fired back into the trunk. One shot grazed her head. The car stopped, and defendant and Clay opened the trunk. Clay hit her in the head, then she rolled into a ditch. After the car drove off, C— W— walked across the street and asked someone to call the police.

At 2:00 a.m., August 30, 1987, police officer Richard Winston arrived and found C— W—. She was taken to Normandy Hospital and then to Regional Hospital. While she was at Regional Hospital, Detective Magee interviewed her.

On cross-examination, defense counsel attempted to impeach C— W— with inconsistencies between her trial testimony and statements she had made prior to trial. The impeachment focused on subjects collateral to the incidents constituting the crime charged such as: her and her husband's past experiences with drugs, how long she stayed at her cousin's house, whether she went to a motel or to defendant's house after visiting Sharon, who she talked with when she called Detroit, who gagged her with plastic, and her description of defendant's features. In responding to the prosecutor's objection to the extent of this cross-examination, the court itself noted the examination was not only extensive, it was focused on "collateral issues."

■ Later, during the direct examination of Detective Magee, he was allowed to relate the statements C— W— had made to him describing what had occurred. Over defense counsel's objections, he related C— W—'s statements as a clear, concise, and coherent description of the scenario, focused primarily on the incidents constituting the crimes in issue and not on the collateral incidents upon which C— W— had been impeached.

On appeal, as at trial, defendant contends this testimony was an improper use of C— W—'s prior consistent statement to bolster her trial testimony. We agree that the admission of this testimony of Detective Magee was error, but, on the present record, it was harmless.

■ A witness's prior consistent statements may be used to corroborate the witness's testimony only on those subjects on which the witness has been impeached. *State v. Fleming,* 354 Mo. 31, 188 S.W.2d 12, 16 (1945); *State v. Clark,* 711 S.W.2d 928, 933 (Mo.App.1986). Here, C— W— was not impeached on her testimony describing the incidents constituting the

crimes charged and, thus, her prior consistent statements about those incidents were inadmissible. *Fleming, supra; Clark, supra.* The admission of her statements, however, was harmless error.

■ Our courts have used two factors to determine whether prejudice was worked by the improper admission of prior consistent statements: whether the declarant is available for cross-examination and whether the statements are simply cumulative evidence. *E.g. State v. McMillin,* 783 S.W.2d 82, 98–99 (Mo. banc 1990).

Why cross-examination lessens the prejudicial effect of erroneously admitted prior consistent statements has not been expressly stated by our courts. The rationale may be that cross-examination obviates the hearsay dangers of unreliability inherent in prior consistent statements. *See, State v. Robinson,* 484 S.W.2d 186, 189 (Mo.1972); *State v. Long,* 532 S.W.2d 814, 819 (Mo. App.1975). *But see, State v. Seever,* 733 S.W.2d 438 (Mo. banc 1987). Here, C__ W__ was available for cross-examination.

■ The second factor, whether the statements are cumulative evidence, has been applied in two ways by our courts. One way finds the prior consistent statement to be cumulative because it is identical to the declarant's trial testimony. *See, State v. Morris,* 639 S.W.2d 589, 592 (Mo. banc 1982); *State v. Haggard,* 619 S.W.2d 44, 48 (Mo. banc 1981); *State v. Clark,* 711 S.W.2d 928, 933 (Mo.App.1986). This method is questionable. Repeating the unimpeached trial testimony of a witness with identical prior statements is the very essence of bolstering.

The other way is to find the statements simply cumulative if the substance of the witness' trial testimony is proven by evidence other than the statements. *See, McMillin, supra* at 98–99; *Broome v. Bi-State,* 795 S.W.2d 514, 519–520 (Mo.App. 1990); *State v. Askew,* 570 S.W.2d 798, 801 (Mo.App.1978). We use this method here.

■ Officer Winston, the officer who found C__ W__ on the street, testified that C__ W__ told him that defendant had shot her in the shoulder, tied her up and, then,

two other people placed her in the trunk of a car. Although defendant did object to this testimony as hearsay, his objection was overruled, and defendant has not discussed why this testimony of Officer Winston, in the context in which it was admitted, constituted an improper use of C__ W"'s prior consistent statements. We are not permitted to develop defendant's arguments for him. Winston's testimony made Magee's testimony cumulative.

Moreover, other evidence corroborated C__ W__'s trial description of the crimes. Officer Magee testified that C__ W__ identified a photograph of defendant as the "person [that] shot and kidnapped me". Another police officer, John Hutt, testified that a car owned by defendant was found burning, and the trunk of the car contained bullet holes showing bullets were fired from inside the trunk. And, defense counsel did not impeach C__ W__'s identification of pieces of plastic found in that trunk as the plastic placed under her when she was put into the trunk. This evidence, with Officer Winston's testimony and the availability of C__ W__ for cross-examination, obviated any prejudice which might have been worked by Officer Magee's testimony about C__ W__'s prior consistent statements. *McMillin, supra* at 98–99.

■ Defendant next contends the trial court erred in permitting C__ W__ to testify that defendant injected himself with cocaine during the days preceding the assault. This testimony implicitly shows defendant possessed cocaine and, therefore, defendant contends, the testimony is inadmissible evidence of a prior, uncharged crime. We disagree.

■ Generally, evidence of a crime separate and distinct from the crime charged is inadmissible. *State v. Mallett,* 732 S.W.2d 527, 534 (Mo. banc 1987); *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Exceptions have been made to this general rule, however. Evidence of the uncharged crime which has independent logical relevance to a fact in issue may be admissible, see, e.g. *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304, 307

(1954), if its prejudicial effect does not outweigh its probative value. *Id.; Mallett, supra,* at 534. Thus, evidence of an uncharged crime is admissible if it tends to establish motive, intent, identity, the absence of mistake or accident, or a common scheme or plan embracing the commission of two or more crimes so related that the proof of one tends to establish the other. *Mallett, supra,* at 534; *Reese, supra,* at 307. This list of theories for establishing independent logical relevance is not exclusive. *See, e.g. State v. Shumate,* 478 S.W.2d 328, 330–331 (Mo.1972); *State v. Sinovich,* 329 Mo. 909, 46 S.W.2d 877, 880 (1931).

C— W—'s testimony about defendant's use of cocaine is relevant here to show defendant's motive for the assault. According to C— W—, Sharon wrote a note to defendant accusing her of stealing defendant's cocaine. Defendant confronted C— W— about the accusation, which she denied. Defendant saw her make a phone call and asked if she called the police. She called 911 because defendant was acting "paranoid" about her taking his cocaine. Defendant confronted her again, asking why she took his cocaine at Fatman's house. When she denied she took any cocaine, defendant struck her with a pistol. He asked her if she set him up with the police. She also said that, on the day she was assaulted, defendant took cocaine several times.

This testimony shows that defendant had a motive for assaulting C— W—. He believed she was taking his cocaine. Moreover, the trial court had discretion in weighing the probative value of this evidence against its possible prejudicial effect. *State v. Mallett, supra,* 732 S.W.2d at 535. The court did not abuse its discretion here.

Defendant also contends the trial court erred by failing to grant a mistrial at three points during the rebuttal portion of the prosecutor's closing argument. However, two of these claims were not raised by defendant in his motion for a new trial, and there was no objection at trial to the argument which defendant asserts as error in his third claim. Therefore, defendant did not preserve these claims for review on appeal. *E.g. State v. Bailey,* 714 S.W.2d 590, 593 (Mo.App.1986). Nonetheless, *ex gratia,* we have reviewed these claims and find no plain error. *See State v. Clemmons,* 753 S.W.2d 901, 907–908 (Mo. banc 1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988).

■ Defendant next challenges the validity of his sentences. Defendant was expressly charged as a class X offender only on the assault count. After a hearing, the court made the appropriate findings of defendant's prior felony convictions and, then, found him to be a class X offender. However, rather than sentencing defendant as a class X offender only on the assault count, the court sentenced him as a class X offender on all three counts. On appeal, for the first time, defendant contends the court committed plain error in sentencing him as a class X offender on the two counts in which he was not so charged.

There are a substantial number of cases in which the court found that no prejudice was worked by an information which improperly charged the defendant under our repeat offender statutes. *E.g. Anglin v. State,* 759 S.W.2d 375, 376–377 (Mo.App. 1988); *State v. Cooper,* 744 S.W.2d 447, 449–450 (Mo.App.1987); *State v. Street,* 735 S.W.2d 371, 373–374 (Mo.App.1987); *State v. Stapleton,* 661 S.W.2d 620, 621–622 (Mo.App.1983). Of these, *State v. Street* is the most similar to the present case.

In *Street,* the information failed to charge defendant to be a prior or persistent offender; no request was made to amend the information; and no mention of this deficiency was made until it was raised as an issue on appeal. *Id.* at 373. Nonetheless, at trial, the court conducted a hearing on defendant's alleged prior offenses, found them to exist, found defendant to be a prior and persistent offender, and sentenced him accordingly. *Id.*

On appeal, the court, in effect, found there was no notice of the state's intent to charge the defendant as a prior and persistent offender, and, thus, insofar as charge of a repeat offender was concerned, "the

error [was] manifest." *Id.* However, the defendant's "previous convictions were never a matter of doubt", the court said, and, for that reason no prejudice was worked against the defendant. *Id.* Since the "provisions for repeat offender sentencing do not create an additional substantive offense", the error associated with a charge of repeat offender does not require "an unconditional remand for a new trial on the issue of guilt...." (citations omitted) *Id.* at 373–374. Following cited precedent, the court remanded the cause for the limited purpose of permitting the state to amend the information and re-submit proof of the prior convictions. *Id.* at 374.

Here, there was no notice of the state's intent to charge defendant as a class X offender on two of the three counts. However, the information, as to the assault count, did charge that defendant had been convicted of three prior felonies, defined in sufficient detail to put defendant on notice that he could be charged as a class X offender. Moreover, defendant has not shown he would have done anything different if he had been charged as a class X offender in all three counts. Thus, the defect in the information worked no prejudice against him.

We follow the lead of *Street* and the precedent cited there. We affirm the convictions, and reverse the imposition of the sentences. We remand the cause for the limited purposes of amending the information, making an appropriate finding on the record that defendant is a repeat offender and resentencing.

 Defendant also contends the court lacked statutory authority to sentence him to a minimum term of eighty percent of his sentence, as a class X offender, on the armed criminal action count. Our criminal code divides felonies into four classes: A, B, C, D. Normally, the statutory definition of a crime includes that statutory classification of that crime. Since August 1988, § 557.021 classifies non-code crimes for the purposes of applying the "extended term" provisions of 558.016 and the "minimum term" provisions of § 558.019 RSMo *cum supp* 1987, effective January 1, 1987.

Defendant contends that armed criminal action is an "unclassified offense" because the statute defining armed criminal action does not also classify it. § 571.015. For this reason, defendant equates armed criminal action to one of those "offenses defined outside [our] code" referred to in § 557.021. Thus, under the present provisions of § 557.021, armed criminal action would be classified for the purpose of applying the "minimum term" provisions of § 558.019 and defendant could be sentenced to a minimum term of 80% of his sentence, as a class X offender, on the armed criminal action count.

However, at the time the armed criminal action is alleged to have occurred, August 1987, defendant notes, § 557.021 expressly classified non-code offenses only for the purpose of applying the extended term provisions of § 558.016 and not for the purpose of applying the minimum term provisions of § 558.019. § 557.021 was amended to include the minimum term provisions in August 1988. Therefore, defendant reasons the court had no statutory authority to sentence him to a minimum term on an armed criminal action which occurred in August 1987. Defendant's argument is not persuasive.

Without agreeing with defendant, we will assume armed criminal action is one of those non-code offense referred to in § 557.021. But, this statute simply classifies a non-code offense on the basis of the "authorized penalty" for that offense. It does not empower the court to impose sentence. It simply defines the limits of the sentence.

Under defendant's own reasoning, § 557.021 classified armed criminal action in August 1987 for the purpose of applying the extended term provisions of § 558.016. But, the minimum term provisions of § 558.019, in effect in August 1987, did not change the "authorized penalty" for armed criminal action. It simply established minimum terms to be served for repeat offenses. Thus, there would be no change in the classification of armed criminal action insofar as it is characterized as a non-code offense. The court had the authority to

sentence defendant for the commission of the armed criminal action pursuant to § 571.015 and the authority to sentence him to a minimum term pursuant to § 558.-019. The fact that armed criminal action was not expressly classified by § 557.021 in 1987 could not and did not prejudice defendant.

Finally, defendant challenges the motion court's denial of his Rule 29.15 motion without an evidentiary hearing. He contends two of his allegations of ineffective assistance of trial counsel required an evidentiary hearing. These allegations are: (1) his counsel failed to investigate and call William Buford as an alibi witness, and (2) his counsel refused to allow him to testify.

### Alibi Witness

■■■■ Failure to call a witness at trial who would provide a defendant a defense may entitle the defendant to an evidentiary hearing on his Rule 29.15 motion. *Tate v. State*, 675 S.W.2d 89, 91 (Mo.App.1984). However, failure to call a witness whose testimony would have been merely cumulative or would have only impeached a state witness does not establish ineffective assistance of counsel. *Id.*; *Decker v. State*, 623 S.W.2d 563, 565 (Mo.App.1981).

■■■ In his motion, defendant alleged that William Buford would have testified that defendant was working for him in Atlanta at the time of the charged crimes. However, at trial, defense counsel did call four alibi witnesses who testified that defendant was in Georgia at the time the charged crimes occurred. Thus, as the motion court found, Buford's testimony would have been merely cumulative. In addition, Earl Smith, one of the witnesses called at trial, testified that defendant worked for him in Atlanta, and, thus, as the motion court also found, Buford's testimony could have conflicted with Smith's testimony. *Id.* Finally, as the motion court found, "Smith's testimony was unshaken by cross-examination at trial, [and] the jury obviously believed evidence that [defendant] had told the arresting FBI agents that he arrived in Georgia in October, not August, as contended at trial." Thus, defendant's alle-

gations about Buford were clearly refuted by the record and no evidentiary hearing on this issue was required. *E.g. Thomas v. State*, 736 S.W.2d 518, 520 (Mo.App.1987).

### Defendant's Failure To Testify

■■■ On appeal, the state agrees that an evidentiary hearing is required to determine whether counsel denied defendant his constitutional right to testify at trial. *See, e.g. Rock v. Arkansas*, 483 U.S. 44, 49–52, 107 S.Ct. 2704, 2708, 2709, 97 L.Ed.2d 37, 45–46 (1987). Accordingly, we reverse the motion court's denial of an evidentiary hearing on this issue and remand the motion to the motion court for that limited purpose, along with appropriate Findings of Fact and Conclusions of Law.

CARL R. GAERTNER, C.J., and SMITH, P.J., concur.